**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | | |
|---|---|---|
| **GENERAL NUTRITION** | : | |
| **INVESTMENT COMPANY** | : | Case No: |
| 300 Sixth Avenue | : | |
| Pittsburgh, Pennsylvania 15222 | : | |
| | : | |
| And, | : | |
| | : | |
| **GNC HOLDINGS, INC.** | : | |
| 300 Sixth Avenue | : | |
| Pittsburgh, Pennsylvania 15222 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **COMPLAINT FOR DAMAGES,** |
| v. | : | **INJUNCTIVE, AND OTHER RELIEF** |
| | : | **FOR VIOLATION OF 15 USC § 1114; 15** |
| **HONGYU ZHANG** | : | **USC § 1125(a); AND RELATED CLAIMS** |
| 644 56th St. | : | |
| Brooklyn, New York 11220 | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| And, | : | |
| | : | |
| **JOHN DOES 1-100**, individually or as | : | |
| corporate/business entities, | : | |
| | : | |
| Defendants. | : | |

Plaintiffs General Nutrition Investment Company and GNC Holdings, Inc. (collectively
"GNC" or "Plaintiffs") bring this action against Defendants Hongyu Zhang ("Defendant Zhang")
and John Does 1-100 (collectively, "Defendants") for trademark infringement in violation of the
Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act, 15 U.S.C.
§ 1125(a); common law trademark infringement; common law unfair competition; unfair trade
practices in violation of 73 P.S. § 201; and tortious interference with existing or prospective
contracts or business relationships, and alleges as follows.  These claims arise from Defendants'
misappropriation of GNC's trademarks in conjunction with Defendants' unlawful and

unauthorized sale of GNC-brand products on the Internet, including the sale of non-genuine, defective, and tampered-with products.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff General Nutrition Investment Company is a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania.

2.      Plaintiff GNC Holdings, Inc. is a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania.

3.      Upon information and belief, Defendant Zhang is an individual who resides in Brooklyn, New York, and is the operator of the storefront "LJ Nutrition Center" previously known as "OK Healthy Nutrition Supplements," "Blue Sky Healthy Store,"  "YoYo Health," "Healthy Center 123," Health Beauty Mall," "Health Young Center," "Be Health" and "union healthybuy" (all iterations referred to collectively herein as "Storefront") on www.amazon.com ("Amazon").

4.      The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of Defendants John Does 1 through 100 are unknown to GNC.  Therefore, GNC sues these Defendants by a fictitious name.  GNC is informed and believes, and on that basis alleges, that the John Doe Defendants sued herein are equally responsible for the events and occurrences referred to herein or otherwise interested in the outcome of the dispute.  When the true names, involvement, and capacities of these parties are ascertained, GNC will seek leave to amend this Complaint accordingly.

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 for GNC claims that arise under federal law and 28 U.S.C. § 1367 for GNC claims that arise under state law because they form part of the same case or controversy as GNC claims that arise under federal law.

6.      This Court has personal jurisdiction over Defendants because they have sold, distributed, offered for sale, and/or advertised goods in Pennsylvania and directed their tortious activities toward Pennsylvania by engaging in actions and infringing on GNC trademarks with the knowledge that GNC is located in Pennsylvania and their actions would likely injure GNC in Pennsylvania.  Defendants have (1) transacted business in Pennsylvania; (2) contracted to supply products in Pennsylvania; (3) shipped merchandise directly or indirectly into or through Pennsylvania; (4) caused harm or tortious injury by acts or omissions in Pennsylvania; and (5) caused harm or tortious injury to GNC by acts or omissions outside of Pennsylvania.

7.      Defendants have created an interactive online Storefront on Amazon.  Through this interactive Storefront, Defendants actively advertise, market, sell, ship, and distribute infringing products bearing GNC's trademarks in Pennsylvania and to Pennsylvania residents.  Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

8.      Defendants' activities in Pennsylvania have been significant and they have made substantial and regular sales of infringing products bearing GNC's trademarks to Pennsylvania. Defendants have sold, and continue to regularly sell, additional infringing products bearing GNC's trademarks into Pennsylvania and to Pennsylvania residents.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS
### GNC and its Trademarks

10.     GNC manufactures and sells a wide range of premium-quality health, wellness, fitness, and nutrition products, including vitamin, mineral, and herbal supplements under the

GNC®, BodyDynamix®, and Beyond Raw® brands (the "GNC Products").  Aside from the sales it makes direct to consumers, GNC sells its products exclusively through a network of authorized resellers ("Authorized Retailers").

11.     GNC devotes a significant amount of time, energy, and resources toward protecting the value of the GNC brands, products, name, and reputation.  By distributing GNC Products exclusively through its Authorized Retailers, GNC ensures that consumers receive the high-quality products they expect from GNC, and maintain the integrity and reputation of the GNC brand.  In the highly-competitive health and nutrition market, quality and customer service are fundamental parts of the consumer's decision to purchase a product.

12.     To promote and protect the GNC brands, GNC has registered numerous trademarks with the United States Patent and Trademark Office, including, but not limited to: GNC® and iterations thereof (U.S. Trademark Registration Nos. 1,786,007; 2,180,647; 3,429,065; 4,863,300; 4,772,720), BODYDYNAMIX® (U.S. Trademark Registration No. 5,479,487), and BEYOND RAW® (U.S. Trademark Registration No. 3,946,340) (collectively, the "GNC Trademarks").

13.     The registration for each of the GNC Trademarks is valid, subsisting and in full force and effect.  Further, pursuant to 15 U.S.C. § 1065, the GNC Trademarks serve as conclusive evidence of GNC ownership of the marks and its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of the GNC Products identified in the registrations, as provided by 15 U.S.C. § 1115(b).

14.     The GNC General Nutrition Centers® trademark was filed on November 5, 1992, and registered on August 3, 1993.  GNC has used iterations of this and other GNC® trademarks since that time.

15.     GNC actively uses, advertises, and markets all of the GNC Trademarks in commerce throughout the United States.

16.     Consumers recognize GNC as the name associated with nutritional supplements that maintain the highest standard of truth in labeling, ingredient safety, and product potency.

17.     GNC is known for remaining on the cutting-edge of nutritional science and remaining devoted to helping its customers improve the quality of their lives.

18.     For all of these reasons, the GNC Trademarks are widely recognized by the general consuming public of the United States and GNC is recognized as the source of products bearing the GNC Trademarks.

19.     Due to the superior quality and exclusive distribution of GNC Products, and because GNC is uniquely recognized as the source of these high quality products, the GNC Trademarks have substantial value.

## Online Marketplaces and the Challenges They Present to GNC Product Quality

20.     E-commerce retail sales have exploded over the past decade.  From 2007 to 2018, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.1% to 9.1%.  *See* Stefany Zaroban, *U.S. e-commerce sales grow 16.0% in 2017*, DIGITAL COMMERCE 360 (Feb. 16, 2018) https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-156-2016/;     E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (May 17, 2018), https://fred.stlouisfed.org/series/ECOMPCTSA.

21.     In 2017, consumers spent $453.46 billion on e-commerce sales, a 16% increase from 2016.  *Id.*  The massive growth in e-commerce is being driven largely by sales on online

marketplaces.  For example, in 2017 United States consumers spent $189.6 billion in e-commerce

sales on Amazon, a 30.1% increase from 2016.  *Id.*

22.     While the online marketplaces have created a great deal of opportunity, they also

greatly challenge a manufacturer's ability to control the quality and safety of its products.

23.     For example, consumers who purchase products through the online marketplaces

cannot touch, inspect, or interact with the product before purchasing it and cannot select a different

product if the one they initially select is damaged or has been tampered with.  Instead, consumers

must trust that the product they choose over the Internet will arrive and be of the quality they

expect and typically receive from the manufacturer.

24.     The online marketplaces also allow third parties to sell products anonymously, i.e.,

without disclosing their actual identity or sources to consumers.  As such, any person who is able

to obtain a manufacturer's products through unauthorized diversion can sell them on the online

marketplaces without having to reveal his/her identity to the consuming public.  This effectively

prevents the manufacturer and the consumer from being able to reach sellers, like Defendants, and

address quality concerns.

25.     It is common for these unauthorized sellers to sell diverted products well past their

expiration date or to mix fake or diluted products in shipments to unwitting consumers.  *See* Scott

Cohn, *Greed Report: Your quest for savings could land you in the 'gray market'*, (Sept. 8, 2016),

https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-

gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on the online

marketplaces that diverters are exploiting because they know consumers trust marketplaces and

assume that the products they are buying through the marketplaces are genuine.  *See* Spencer

Soper, *Amazon Gets Real About Fakes* (Nov. 28. 2016),
https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

26.     In its 2018 annual report to its shareholders, in fact, Amazon admitted that third
party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or
otherwise "materially different" from the product that was described to consumers.  Amazon.com,
Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), available at
https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-
20181231x10k.htm.  Amazon conceded that these actions are "violating the proprietary rights of
others," and warned its investors that Amazon "could be liable for fraudulent or unlawful
activities" of Amazon third party sellers.

27.     Because diverters, like Defendants, operate anonymously on marketplaces and
undertake great measures to maintain anonymity, manufacturers have no ability to exercise their
quality controls over the products sold by the diverters or to ensure that these products are safe.  A
manufacturer's inability to exercise control over the quality of its products presents serious risks
to the health and safety of consumers – particularly where, as here, the products are ingested by
consumers.

28.     Online marketplaces also pose threats to a manufacturer's ability to maintain its
goodwill, reputation, and brand integrity because their construction and user interface suggest that
all sellers on the marketplaces are all selling the same product when – as is the case here – they
are not.

29.     When purchasing products on a marketplace, customers cannot easily distinguish
between a manufacturer's authorized and unauthorized sellers.  Indeed, on some marketplaces all
sellers are listed under one product listing, making it practically impossible for consumers to

ascertain which sellers are authorized and subject to the brand's quality standards and which are selling unauthorized products outside of the manufacturer's quality controls. Unlike brick-and-mortar channels where a consumer can simply select another product from the shelf where the initial product selected appears to be of compromised quality, e-commerce consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. This reality requires that brands implement unique quality control programs into their e-commerce channels to protect their goodwill and consumers.

30.    It is widely understood that when a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor quality product, the customer is much more likely to associate that problem with the brand/manufacturer than the anonymous seller.

31.    The online marketplaces give disgruntled customers a powerful and convenient forum to air their grievances about problem products – online product reviews. Any consumer who is dissatisfied with a product he/she receives can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand/manufacturer of a product rather than the marketplace seller that sold the product.

32.    It is widely accepted that, product reviews on the online marketplaces have a significant impact on a brand's reputation. Survey results show that 82% of United States adults sometimes consult online reviews for information when they consider buying a new product online and 40% "always" or "almost always" consult such reviews. *See Online Shopping and E-Commerce: 2. Online reviews*, Pew Research Center (Dec. 19, 2016) http://www.pewinternet.org/2016/12/19/online-reviews/.

33.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are over 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *See Moms Place Trust in Other Consumers*, EMARKETER (Feb. 10, 2010)   https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, Fox Business, Feb. 28, 2019,  https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

34.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  *See* Graham Charlton, *How many bad reviews does it take to deter shoppers?* (Apr. 12, 2011),  https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

35.     Negative reviews may also hurt a brand's product placement in search results, further reducing the likelihood that customers will purchase the products.

**GNC Has Been the Target of Numerous Negative Online Marketplace Reviews from Customers Who Purchased Products from Sellers Who, Like Defendants, Did Not Implement the Quality Controls that GNC Requires for Online Sales**

36.     Consumers who purchase from anonymous, unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing.  These negative reviews injure consumer perceptions of the brand's quality and reputation,

as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

37.     GNC has been the subject of numerous negative online marketplace reviews from customers who purchased products from sellers, like Defendants, that failed to implement the quality controls that GNC requires of its authorized online sellers.  These customers complain of receiving damaged, counterfeit, or otherwise low-quality products and give the GNC product a 1-star rating, reducing the product's average rating and reputation.

38.     For example, on December 10, 2015, Amazon user "Real deal 1215" complained that Defendants shipped the wrong product and failed to respond to the customer's email inquiry.

> ⭐☆☆☆☆  "Received wrong product, emailed seller and no response."
> By Real deal 1215 on December 10, 2015.

39.     On May 12, 2017, Amazon user "Lena Cox" complained that the product she purchased from Defendants was shipped with a broken seal and that "it tasted very weird . . ."

> ⭐☆☆☆☆  "The package came in and the seal on the canister was broken. I thought my husband had opened it earlier that morning so I went ahead and made my shake. It tasted very weird and NOT like vanilla at all. My husband said he never opened it which really freaked me out."
> Read less
> By Lena Cox on May 12, 2017.

40.     On March 5, 2018, Amazon user "Aaron" complained that Defendants first shipped the wrong item "and then someone placed [a] sticker over the instructions."



> ⭐☆☆☆☆  "You sent the incorrect item. It took 5 days to get the wrong item and then someone placed sticker over the instructions. The new price for the item I do want is now almost $3 more. I am very disappointed. I am about to return the wrong item you sent and then I have to wait a week for you to refund. I can buy this cheaper directly from the company and probably get it faster."
> Read less
> By Aaron on March 5, 2018.

41.     On November 5, 2018, Amazon customer "lori" complained that the product Defendants advertised was "a 60 day supply with 10 mix ins," but the item she received was "1 30 day supply only. . ."



42.     On December 11, 2018, Amazon user "amay6442" complained that the she only received one of the two items she purchased from Defendants, and that because Defendants did not allow returns, "[she] just paid double!"



43.     On December 21, 2018, an Amazon customer complained that the product purchased from Defendants 'looked like it had been opened and resealed," leading the customer to question the product's authenticity.



### GNC Has Implemented Strict Quality Controls to Combat the Problems Presented by the Online Marketplaces and Protect the Value of Its Trademarks

44.     Recognizing the health and safety risks to its consumers and the reputational concerns associated with the illegal sale of GNC Products by unauthorized sellers, GNC has implemented a quality control program that applies to both brick and mortar retail sales and online sales with the twin aims of protecting consumers and protecting the value and goodwill associated with the GNC brands.

11

45.     The goal of this program is to ensure that consumers who buy GNC Products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the GNC name – in particular, safety and quality.

46.     The program seeks to minimize the likelihood that poor-quality products will reach consumers, which minimizes harm to the brand's goodwill.

47.     GNC's ability to exercise these quality controls is particularly important for the products it sells because consumers ingest the products and there are numerous health and safety risks associated with consumers ingesting products that are expired or that have not been stored and handled properly.

48.     GNC's ability to exercise these quality controls is essential to the integrity, safety, and quality of GNC Products, as well as the value of the GNC Trademarks and other intellectual property.

**Authorized Retailers Are Required to Adhere to GNC
Quality Control and Customer Service Requirements**

49.     GNC maintains its strict quality controls over GNC products by ensuring consumers received GNC products purchased from GNC or an Authorized Retailer.

50.     Authorized Retailers are required to sell products only in certain channels and must abide by GNC's Authorized Retailer Policy and other sales practices and policies (collectively, the "GNC Policies").

51.     To prevent third parties from acquiring and reselling GNC Products, the GNC Policies permit Authorized Retailers to sell products only to end users.  Authorized Retailers are prohibited from selling GNC Products to anyone who intends to resell the products.

52.     Except for a limited number of Authorized Sellers who are permitted to sell GNC products on Amazon, Authorized Sellers are permitted to sell GNC products online only on their

own proprietary websites, provided that those websites satisfy certain criteria and comply with GNC's quality control standards for online sales ("Permissible Public Websites").

53.     To qualify as a Permissible Public Website, a website must be operated by the Authorized Seller in the Authorized Seller's legal name or registered fictitious name and must state the Authorized Seller's legal name or registered fictitious name and contact information. Permissible Public Websites may not give the appearance that they are operated by GNC or any third-party.  Permissible Public Websites do not include storefronts on online marketplace websites like Amazon.

54.     GNC's standards and criteria for Permissible Public Websites were established to ensure that the websites represent the GNC brand properly and to prevent sellers from operating the websites in a manner that is inconsistent with or detrimental to the GNC brand.  These standards were also designed to allow GNC to quickly address any product quality issues that may arise.

55.     The GNC Rules prohibit Authorized Sellers from selling anonymously online and instead require Permissible Public Websites to state the seller's legal name or registered fictitious name and current contact information.  This requirement allows consumers to understand the nature of the seller from whom they are purchasing and enables consumers to contact the seller if any quality issues arise.  This requirement also allows GNC to protect the public from the sale of poor-quality and counterfeit GNC products because it permits easy detection of any Authorized Seller who sells poor-quality or counterfeit goods.

56.     The GNC Rules also require that Permissible Public Websites comply with all applicable privacy, accessibility, and data security laws, regulations, and industry standards.

57.     Authorized Sellers must not, on any Permissible Public Website, represent or advertise any GNC product as "new" if the product has been returned with its original packaging

opened or has otherwise been altered by the customer.  Typically, if a customer returns a product that was purchased through a third-party online-marketplace site, the online marketplace will repackage the product and allow it to be relisted as "new."  Indeed, customers purchasing GNC products on Amazon have complained of receiving products that appear to have been used.  *See, e.g.*, *supra* ¶ 42.

58.     Unless otherwise approved by GNC in writing, Authorized Sellers selling on Permissible Public Websites may not use any third-party fulfilment service to store inventory or fulfill orders for GNC products.  This requirement ensures that GNC can quickly investigate and address any quality-control or customer-service issues related to order fulfillment.

59.     Permissible Public Websites must have a mechanism for receiving customer feedback, and Authorized Sellers must take appropriate steps to address any feedback received.

60.     The additional quality-control requirements that GNC imposes on its Authorized Sellers who sell on Permissible Public Websites are legitimate and substantial and have been implemented to allow GNC to control the quality of GNC products that are sold online and to quickly address any quality issues that arise.

61.     GNC's quality controls are material, as they have been implemented to ensure that consumers purchasing GNC products online receive genuine, high-quality GNC products that abide by GNC's quality controls.  Consumers purchasing GNC products online would find it relevant to their purchasing decisions to know whether the products they are buying are vended by an Authorized Seller who is subject to, and abides by, GNC's quality controls.

62.     Authorized Retailers are also prohibited from selling GNC Products on any website, mobile application, or online/digital sales platform other than a Permissible Public

Website, including Amazon, eBay, Walmart Marketplace, or Jet, without prior written consent of GNC.

63.     These restrictions allow GNC to know who its Authorized Retailers are, which ones are selling online, and how to immediately contact them.

64.     The GNC Policies require Authorized Retailers to adhere to GNC's quality control requirements.  GNC also adheres to these quality control requirements for products it sells direct to consumers.

65.     To ensure that customers receive the genuine and high-quality products they expect from GNC, the GNC Policies require Authorized Retailers to inspect GNC Products pursuant to specific terms.  Upon receiving products, Authorized Retailers are required to inspect the products for damage, defects, broken seals, evidence of tampering, or other non-conformance and to remove any such products from inventory and report the defect to GNC.  To prevent the sale of expired products, Authorized Retailers are also required to inspect inventory regularly for expired or soon-to-be expired products and remove those products from inventory.

66.     The GNC Policies also require that Authorized Retailers store products in accordance with guidelines issued by GNC.  Importantly, for the health and safety of consumers, Authorized Retailers must store GNC Products in a low-humidity environment where they are not susceptible to mold or mildew, and away from direct sunlight, extreme heat, and dampness, and in accordance with any other storage guidelines specified by GNC.

67.     To avoid consumer confusion and ensure that customers receive genuine GNC Products, Authorized Retailers must sell GNC Products in their original packaging and refrain from altering any product or removing or modifying any label or literature on or accompanying the product.  Authorized Retailers are prohibited from altering, defacing, or removing any serial

number, UPC code, batch or lot code, or other identifying information on any product or product packaging.

68.     GNC also ensures that consumers receive quality and safe products by requiring its Authorized Retailers to communicate all safety information to end-user customers and to cooperate with GNC with respect to any product recall or other consumer safety information dissemination efforts.

69.     Following the sale of genuine GNC Products, Authorized Retailers supply ongoing support to end-user consumers and are endeavored to provide expeditious customer service by responding promptly to consumer inquiries.

70.     GNC's quality control requirements are legitimate, substantial, and non-pretextual and have been implemented so that GNC can control the quality of goods manufactured and sold under the GNC Trademarks, so as to protect consumers, as well as the value and goodwill associated with the GNC Trademarks.

71.     GNC's quality control requirements are also material.  Consumers would find it relevant that these quality controls exist and that GNC exercises these quality controls over the products sold by its Authorized Retailers, but that it is unable to exercise its quality controls over products sold by unauthorized sellers.

**Genuine GNC Products Come with a Guarantee; Defendants' Products Do Not**

72.     GNC products purchased from GNC or an Authorized Retailer also come with a 30-Day Money Back Guarantee ("The Guarantee").  Under the Guarantee, customers who are not satisfied with an item that they purchased from GNC or an Authorized Retailer may return the item to GNC within 30 days from the order date for a full refund of the purchase price, minus shipping and handling. *See The Guarantee at* https://www.gnc.com/customer-service/returns/30-day-guarantee.html

73.     GNC cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to GNC's control. For this reason, the Guarantee is not available for GNC products sold by unauthorized sellers, such as Defendants or through unauthorized channels, unless prohibited by law.

74.     The Guarantee is a material component of genuine GNC products. Consumers who purchase GNC products with the Guarantee receive the peace of mind that: they are receiving a high-quality product, GNC stands behind the product, and if they are dissatisfied with the product they receive, they will have the ability to return the product to GNC.

75.     Consumers would find it material and relevant to their purchasing decision to know whether a GNC product they were considering buying was covered by the Guarantee. If a consumer knew a product did not come with the Guarantee, the consumer would be less likely to purchase the product.

**Defendants Are Illegally Selling Products Bearing the GNC Trademarks and Interfering with GNC's Quality Controls**

76.     Due to the health and safety risks, as well as customer and reputational concerns, associated with the illegal sale of GNC Products by unauthorized sellers, GNC polices the sale of GNC Products online.

77.     Through these efforts, GNC discovered GNC Products being illegally sold by Defendants on Amazon under a series of ever-changing storefront names, currently known as "LJ Nutrition Center."

78.     Defendants are not Authorized Retailers of GNC Products.

79.     Defendants sell products on the Storefront.

80.    Because Defendants are not Authorized Retailers of GNC Products and sell products anonymously, GNC is unable to exercise control over the quality of products Defendants sell bearing the GNC Trademarks.

81.    Defendants' sales of products bearing the GNC Trademarks interfere with GNC's ability to exercise quality control over products bearing the GNC Trademarks because GNC is unable to audit Defendants to ensure they are complying with GNC's quality controls and/or close their account if they fail to comply with GNC's quality control requirements.

82.    The products Defendants sell are not genuine GNC Products because the products are not eligible for the Guarantee that accompanies products purchased from GNC or its Authorized Retailers.

83.    The products Defendants sell are not genuine GNC Products because the products are not authorized for sale by GNC and are not subject to, and interfere with, GNC's quality controls.

84.    The products Defendants sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products, which are essential elements of GNC Products.

85.    Despite these facts, Defendants have sold, and continue to sell products bearing the GNC Trademarks through the Storefront without GNC's consent.

86.    Upon information and belief, Defendants, through their storefront on Amazon, accept and fulfill orders from Pennsylvania residents for GNC Products and ship GNC Products to persons located in Pennsylvania.

**GNC Attempted to Stop Defendants' Illegal Sale of Products
Bearing the GNC Trademarks but Defendants Continue to
Willfully Infringe on the GNC Trademarks**

87.     After GNC discovered products bearing the GNC Trademarks being illegally sold on the Storefront, GNC investigated the storefront to determine who was operating the storefront. Through that investigation, GNC identified Defendant Zhang as the operator of the Storefront.

88.     Additionally, a prior subpoena to Amazon to confirm the operator and address related to the Storefront confirmed that the storefront is registered to Hongyu Zhang, at 644 56th St., Brooklyn, NY 11220.

89.     On or about February 26, 2019, counsel for GNC sent Defendant Zhang a cease-and-desist letter, demanding that Defendants immediately cease selling products bearing the GNC Trademarks.

90.     Defendants did not respond to this letter and continued to sell products bearing the GNC Trademarks through the Storefront.

91.     On or about March 8, 2019, counsel for GNC sent another cease-and-desist letter to Defendant Zhang. This letter demanded that Defendants cease selling products bearing the GNC Trademarks and also warned of the legal duty to not destroy relevant evidence in light of imminent litigation with GNC.

92.     The March 8, 2019 letter specifically put Defendant Zhang on notice that suit could be filed in Pennsylvania for continued sales, stating, "You should be aware that if you continue to ignore GNC's demands and continue to sell GNC Products unlawfully, you will be **subject to personal jurisdiction in Pennsylvania** where GNC is located. *See, e.g., Amini Innovation Corp. v. JS Imps, Inc.*, 497 F. Supp. 2d 1093, 1106 (C.D. Cal. 2007) (explaining that numerous courts have held that a defendant is subject to personal jurisdiction in the state where a plaintiff mark owner is located if the defendant intentionally infringes the plaintiff's intellectual property

while knowing where the plaintiff is located).  This letter serves as express notice to you that GNC's headquarters in the United States is located in the State of Pennsylvania, your infringing sales harm GNC, and that the effects of your unlawful actions are suffered in Pennsylvania where GNC is located."

93.     Defendants again failed to respond to this letter and continue to offer products bearing the GNC Trademarks through the Storefront.

94.     On or about April 18, 2019, counsel for GNC sent another letter to Defendant Zhang.  This letter warned that GNC would take further action if Defendants did not immediately cease and desist selling products bearing the GNC Trademarks.  GNC did not receive a response to its letter, and the Storefront continued to offer products bearing the GNC Trademarks for sale.

95.     The April 18, 2019 letter again put Defendants on notice that they could be sued in the Western District of Pennsylvania.

96.     Defendants again failed to respond to this letter and continue to offer products bearing the GNC Trademarks through the Storefront.  Shortly thereafter, Defendant Zhang changed the storefront name to "OK Healthy Nutrition Supplements" and then to "LJ Nutrition Center," presumably to avoid detection.

97.     For the reasons discussed above, the products Defendants sell are not genuine GNC Products, are not eligible for the Guarantee, are not subject to GNC's quality control requirements, interfere with GNC's quality controls, and are materially different from genuine GNC Products.

98.     Particularly troubling is the sheer volume of GNC products Defendants have sold in violation of the GNC Trademarks:  (1) nearly 5,000 units in May 2019 to-date; (2) over 9,000 units in April 2019; and (3) nearly 6,000 units in March 2019.

99.     By continuing to sell non-genuine products bearing the GNC Trademarks, Defendants have interfered with GNC's ability to exercise control over products being sold bearing the GNC Trademarks.

100.    Defendants have also misled, and continue to mislead, consumers into believing they are purchasing genuine GNC Products when, in fact, they are not.

101.    Defendants' actions infringe on the GNC Trademarks.

102.    Further, Defendants' disregard of communications from GNC and continuation of selling of non-genuine products despite being informed of their unlawful conduct, demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants are Tortiously Interfering with GNC's Agreements with its Authorized Sellers**

103.    Other than products that GNC itself sells direct to consumer, GNC sells GNC products only to Authorized Sellers.

104.    Defendants have sold a high volume of products bearing the GNC Trademarks through the Storefront.

105.    Defendants are not Authorized Sellers, and GNC has not itself sold any GNC products to Defendants.

106.    Although GNC must take discovery in this action to learn how Defendants acquired the products bearing GNC Trademarks that they have resold, based on these facts it is likely that Defendants have obtained those products from one or more Authorized Sellers.

107.    Upon information and belief, Defendants have purchased products from GNC's Authorized Sellers for the purpose of reselling the products on the Internet without GNC's approval, with full knowledge that such behavior would unlawfully infringe upon the GNC Trademarks.

108.    GNC's agreements with its Authorized Sellers prohibit Authorized Sellers from selling GNC products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

109.    Defendants were informed of this prohibition by at least February 26, 2019.  On that date, Defendants received a cease-and-desist letter from GNC.  The letter informed Defendants that the contracts between GNC and its Authorized Sellers prohibit Authorized Sellers from selling GNC products to any person or entity that is not an Authorized Seller and intends to resell the products.

110.    GNC's letter also informed Defendants that, by purchasing GNC products from an Authorized Seller for purposes of resale, they were causing a breach of the agreement between GNC and its Authorized Seller and were interfering with GNC's agreements and business relationships.

111.    GNC's letter also informed Defendants that if they continued to acquire products from GNC's Authorized Sellers for the purpose of reselling them, they would be liable for tortiously interfering with GNC's contracts and/or business relationships.

112.    Despite being provided this information, upon information and belief, Defendants have continued to acquire products from GNC's Authorized Sellers with the intent to resell them.

113.    Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with GNC so they can acquire products bearing the GNC Trademarks and unlawfully infringe upon the GNC Trademarks by reselling the products.

**GNC Has Suffered Significant Harm as A Result of Defendants' Conduct**

114.    GNC has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

115.    GNC has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

116.    GNC is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell GNC Products, causing continued irreparable harm to GNC's reputation, goodwill, relationships, intellectual property and brand integrity.

117.    Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton and contrary to law.

118.    Defendants' willful violations of the GNC Trademarks and continued pattern of misconduct demonstrate intent to harm GNC.

**<u>FIRST CAUSE OF ACTION</u>**
**Trademark Infringement**
**U.S.C. §§ 1114 and 1125(a)(1)(a)**

119.    GNC hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

120.    GNC is the owner of the GNC Trademarks.

121.    GNC has registered the GNC Trademarks with the United States Patent and Trademark Office.

122.    The GNC Trademarks are valid and subsisting trademarks in full force and effect.

123.    Defendants willfully and knowingly used, and continue to use, the GNC Trademarks in commerce for purposes of selling GNC Products on the Internet without GNC's consent.

124.    The products Defendants sell are not genuine GNC Products because the products are not authorized for sale by GNC, are not eligible for the Guarantee, are not subject to GNC's quality controls, and are materially different from genuine GNC Products.

125.    Defendants' unauthorized sale of products bearing the GNC Trademarks interferes with GNC's ability to exercise quality control over products bearing the GNC Trademarks because GNC is unable to audit Defendants to confirm they are complying with GNC's quality control requirements and/or close their account if they fail to comply with GNC's quality control requirements.

126.    The products Defendants sell are materially different from genuine GNC Products because they are not subject to, and interfere with, GNC's quality controls.

127.    The products Defendants sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products.

128.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are subject to GNC's quality controls when they are not.

129.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are genuine GNC Products when they are not.

130.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with GNC when they are not.

131.    Defendants' unauthorized use of the GNC Trademarks has materially damaged the value of the GNC Trademarks, caused significant damage to GNC business relations, and infringed on the GNC Trademarks.

132.    As a proximate result of Defendants' actions, GNC has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

133.    GNC is entitled to recover its damages caused by Defendants' infringement of the GNC Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

134.    GNC is entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, GNC will suffer irreparable harm.

135.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the GNC Trademarks.

<u>**SECOND CAUSE OF ACTION**</u>
**Unfair Competition**
**15 U.S.C. § 1125(a)**

136.    GNC hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

137.    GNC is the owner of the GNC Trademarks.

138.   GNC has registered the GNC Trademarks with the United States Patent and Trademark Office.

139.   The GNC Trademarks are valid and subsisting trademarks in full force and effect.

140.   Defendants have willfully and knowingly used, and continue to use, the GNC Trademarks in interstate commerce for purposes of selling and advertising products bearing the GNC Trademarks without GNC's consent.

141.   The products Defendants advertise and sell are not genuine GNC Products because the products are not authorized for sale by GNC, are not eligible for the Guarantee, are not subject to GNC's quality controls, and are materially different from genuine GNC Products.

142.   Defendants' unauthorized advertisement and sale of products bearing the GNC Trademarks interferes with GNC's ability to exercise quality control over products bearing the GNC Trademarks because GNC is unable to audit Defendants to confirm they are complying with GNC's quality control requirements and/or close their account if they fail to comply with GNC's quality control requirements.

143.   The products Defendants advertise and sell are materially different from genuine GNC Products because they are not subject to, and interfere with, GNC's quality controls.

144.   The products Defendants advertise and sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products.

145.   Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to GNC's quality control program when they are not.

146.    Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine GNC Products when they are not.

147.    Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, approved by, or otherwise connected with GNC when they are not.

148.    Defendants' unauthorized sale of products bearing GNC Trademarks and unauthorized use of GNC Trademarks in advertising infringes on the GNC Trademarks.

149.    Defendants' unauthorized sale of products bearing GNC Trademarks, and unauthorized use of GNC Trademarks in advertising, has materially damaged the value of the GNC Trademarks and has caused significant damages to GNC business relations.

150.    As a proximate result of Defendants' actions, GNC has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

151.    GNC is entitled to recover its damages caused by Defendants' infringement of the GNC Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

152.    GNC is entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, GNC will suffer irreparable harm.

153.    GNC is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the GNC Trademarks.

### THIRD CAUSE OF ACTION
### Common Law Trademark Infringement

154.    GNC hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

155.    GNC is the owner of the GNC Trademarks.

156.    GNC has registered the GNC Trademarks with the United States Patent and Trademark Office.

157.    The GNC Trademarks are valid and subsisting trademarks in full force and effect.

158.    The GNC Trademarks are distinctive and widely recognized by the consuming public.  GNC Products are sold and purchased through its Authorized Retailers throughout the United States, including Pennsylvania.

159.    GNC is widely recognized as the designated source of goods bearing the GNC Trademarks.

160.    Defendants willfully and knowingly used, and continue to use, the GNC Trademarks in interstate commerce for purposes of selling products bearing the GNC Trademarks without GNC's consent.

161.    The products Defendants sell are not genuine GNC Products because the products are not authorized for sale by GNC, are not eligible for the Guarantee, are not subject to GNC's quality controls, and are materially different from genuine GNC Products.

162.    Defendants' unauthorized sale of products bearing the GNC Trademarks interferes with GNC's ability to exercise quality control over products bearing the GNC Trademarks because

GNC is unable to audit Defendants to confirm they are complying with GNC's quality control requirements and/or close their account if they fail to comply with GNC's quality control requirements.

163.    The products Defendants sell are materially different from genuine GNC Products because they are not subject to, and interfere with, GNC's quality controls.

164.    The products Defendants sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products.

165.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are subject to GNC's quality control program when they are not.

166.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are genuine GNC Products when they are not.

167.    Defendants' unauthorized sales of products bearing the GNC Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with GNC when they are not.

168.    Defendants' knowing and willful use of the GNC Trademarks in connection with the unauthorized and illegal sale of products bearing the GNC Trademarks without GNC's consent infringes on the GNC Trademarks and is contrary to honest practice in industrial and commercial matters.

169.    Defendants' unlawful actions and unauthorized use of the GNC Trademarks has materially damaged the value of the GNC Trademarks, caused significant damage to GNC business relations, and infringed on the GNC Trademarks.

170.    Defendants' unlawful actions and unauthorized use of the GNC Trademarks has materially damaged the value of the GNC Trademarks, caused significant damage to GNC business relations, and infringed on the GNC Trademarks.

171.    As a proximate result of Defendants' actions, GNC has suffered, and continues to suffer, immediate and irreparable harm.  GNC has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

172.    GNC is also entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward GNC or exhibited a reckless indifference to the rights of GNC.

### FOURTH CAUSE OF ACTION
**Common Law Unfair Competition**

173.    GNC hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

174.    GNC is the owner of the GNC Trademarks.

175.    GNC has registered the GNC Trademarks with the United States Patent and Trademark Office.

176.    The GNC Trademarks are valid and subsisting trademarks in full force and effect.

177.    Defendants willfully and knowingly used, and continue to use, the GNC Trademarks in commerce for the purpose of selling and advertising products bearing the GNC Trademarks without the consent of GNC.

178.    The products Defendants advertise and sell are not genuine GNC Products because the products are not authorized for sale by GNC, are not eligible for the Guarantee, are not subject to GNC's quality controls, and are materially different from genuine GNC Products.

179.    Defendants' unauthorized advertisement and sale of products bearing the GNC Trademarks interferes with GNC's ability to exercise quality control over products bearing the GNC Trademarks because GNC is unable to audit Defendants to confirm they are complying with GNC's quality control requirements and/or close their account if they fail to comply with GNC's quality control requirements.

180.    The products Defendants advertise and sell are materially different from genuine GNC Products because they are not eligible for the Guarantee and they are not subject to, and interfere with, GNC's quality controls.

181.    The products Defendants advertise and sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products.

182.    Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to GNC's quality control program when they are not.

183.    Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine GNC Products when they are not.

184.    Defendants' use of the GNC Trademarks in connection with their unauthorized sale and advertising of products bearing the GNC Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, approved by, or otherwise connected with GNC when they are not.

185.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce customers to believe that Defendants' products are genuine and authentic GNC Products when, in fact, they are not.

186.    Defendants' unauthorized sales of products bearing GNC Trademarks and unauthorized use of GNC Trademarks in advertising infringe on the GNC Trademarks.

187.    Defendants' unauthorized sales of products bearing GNC Trademarks, and unauthorized use of GNC Trademarks in advertising, have materially damaged the value of the GNC Trademarks and have caused significant damages to GNC's business relations.

188.    As a proximate result of Defendants' actions, GNC has suffered, and continues to suffer, immediate and irreparable harm.  GNC has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

189.    GNC is also entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward GNC or exhibited a reckless indifference to the rights of GNC.

## FIFTH CAUSE OF ACTION
### Unfair Trade Practices
### 73 P.S. § 201-2 *et seq.*

190.    GNC hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

191.     GNC is the owner of the GNC Trademarks.

192.     GNC has registered the GNC Trademarks with the United States Patent and Trademark Office.

193.     The GNC Trademarks are valid and subsisting trademarks in full force and effect.

194.     Defendants willfully and knowingly used, and continue to use, the GNC Trademarks in interstate commerce, including through their product listings on Amazon, for purposes of advertising, promoting, and selling products bearing the GNC Trademarks without GNC's consent.

195.     Defendants' advertisements and promotions of products unlawfully using the GNC Trademarks have been disseminated to the relevant purchasing public.

196.     The products Defendants advertise, promote, and sell are not genuine GNC Products because the products are not authorized for sale by GNC, are not eligible for the Guarantee, are not subject to GNC's quality controls, and are materially different from genuine GNC Products.

197.     Defendants' unauthorized advertisements, promotions, and sales of products bearing the GNC Trademarks interferes with GNC's ability to exercise quality control over products bearing the GNC Trademarks because GNC is unable to audit Defendants to confirm they are complying with GNC's quality control requirements and/or close their account if they fail to comply with GNC's quality control requirements.

198.     The products Defendants advertise, promote, and sell are materially different from genuine GNC Products because they are not subject to, and interfere with, GNC's quality controls.

199.    The products Defendants advertise, promote, and sell are materially different from genuine GNC Products because they do not come with the customer service benefits that accompany genuine GNC Products.

200.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of the products Defendants offer for sale passes off goods that are not genuine GNC Products as those of GNC.

201.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the GNC Trademarks causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of Defendants' products because it suggests that the products are sponsored, approved, and certified by GNC when they are not.

202.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the GNC Trademarks causes likelihood of confusion or misunderstanding as to Defendants' products because it suggests that the products Defendants' offer for sale are genuine and authentic GNC Products when, in fact, they are not.

203.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the GNC Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products Defendants offer for sale are subject to GNC's quality control requirements when they are not.

204.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the GNC Trademarks misrepresents the sponsorship, approval, characteristics, uses, or benefits of Defendants' products because it

suggests that the products Defendants offer for sale come with the customer service benefits that accompany genuine GNC Products when they do not.

205.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the GNC Trademarks misrepresents the sponsorship, approval, status, affiliation, or connection of Defendants' products because it suggests that the products Defendants offer for sale are sponsored by, approved by, authorized by, or otherwise connected with GNC when they are not.

206.    Defendants' use of the GNC Trademarks in connection with the unauthorized advertising, promotion, and sale of GNC Products is an unfair trade practice under 73 P.S. § 201-2.

207.    As a result of Defendants' unlawful actions, GNC has suffered, and continue to suffer, irreparable harm.  GNC has also suffered, and continue to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

208.    Pursuant to 73 P.S. § 201-8(a), GNC is entitled to an award of actual damages and up to three times the same for each violation, plus costs and attorneys' fees.

GNC is also entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward GNC or exhibited a reckless indifference to the rights of GNC.

## SIXTH CAUSE OF ACTION
**Tortious Interference with Existing and/or Prospective Contracts and Business Relations**

209.    GNC re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

210.    Other than products that GNC itself sells direct to consumers, GNC products are sold exclusively through GNC's network of Authorized Sellers.

211.    GNC has entered into agreements with its Authorized Sellers to sell GNC products. These agreements specifically prohibit Authorized Sellers from selling GNC products to unauthorized resellers, such as Defendants.

212.    Defendants are not Authorized Sellers of GNC products.

213.    Defendants have sold a high volume of products bearing the GNC Trademarks through the Storefront.

214.    GNC has not itself sold any GNC products to Defendants.

215.    Based on these facts, it is plausible and a reasonable inference that Defendants have purchased the products they are selling, and have resold, from one or more of GNC's Authorized Sellers.

216.    Defendants knew that GNC's agreements with its Authorized Sellers prohibit Authorized Sellers from selling GNC products to anyone who, such as Defendants, is not an Authorized Seller and intends to resell the products.

217.    Defendants had notice of this prohibition at the latest by February 26, 2019, through a cease-and-desist letter they received from GNC.

218.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with GNC's agreements with its Authorized Sellers by inducing the Authorized Sellers to breach their agreements and sell products to Defendants so they could unlawfully resell them on the Internet.

219.    After being notified of this prohibition, Defendants intentionally induced one or more of GNC's Authorized Sellers to breach their agreements with GNC by continuing to acquire products from GNC's Authorized Sellers for the purpose of selling them on the Internet.

220.     Defendants acted with a wrongful purpose and employed wrongful means by acquiring GNC products for the purpose of reselling those products on the Internet in violation of GNC's agreements with its Authorized Sellers.   Specifically, Defendants induced Authorized Sellers to breach their agreements with GNC so that Defendants could unlawfully infringe upon and materially damage the value of the GNC Trademarks by reselling the products they obtained from Authorized Sellers on the Internet.

221.     Because Defendants have refused to disclose how they have obtained the products bearing the GNC Trademarks they have resold, GNC must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants.   Defendants, however, know the sources of the products they have obtained and the basis for GNC's claim of tortious interference. GNC's agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

222.     Defendants' actions have caused injury to GNC for which GNC is entitled to compensatory damages in an amount to be proven at trial.

223.     The injury to GNC is immediate and irreparable, as GNC's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

224.     GNC is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, GNC prays for relief and judgment as follows:

A.     Judgment in favor of GNC and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages,

restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

   B. That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

     i) Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all GNC Products;

     ii) Prohibiting the Enjoined Parties from using any of the GNC Trademarks in any manner, including advertising on the Internet;

     iii) Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all GNC Products as well as any products bearing any of the GNC Trademarks;

     iv) Prohibiting the Enjoined Parties from purchasing any GNC products or any products bearing any GNC Trademarks for purposes of resale from any GNC Authorized Sellers in violation of the contracts between GNC and those Authorized Sellers, or otherwise inducing GNC's Authorized Sellers to breach their contracts with GNC;

     v) Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the GNC Trademarks, including: invoices, correspondence with vendors and distributors, bank records,

account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

vi)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of GNC Products, or any of the GNC Trademarks;

vii)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the GNC Trademarks which associate GNC Products or the GNC Trademarks with the Enjoined Parties or the Enjoined Parties' website;

viii)    Requiring the Enjoined Parties to take all action to remove unauthorized GNC Trademarks from the Internet, including from www.amazon.com;

C.    An award of attorneys' fees, costs, and expenses; and

D.    Such other and further relief as the Court deems just, equitable and proper.

Date: May 17, 2019

/s/ Mark C. Zheng
Mark C. Zheng (Pa. Bar 313510)
Vorys, Sater, Seymour and Pease LLP
500 Grant Street, Suite 4900
Pittsburgh, PA 15219-2502
Phone: (412) 904-7704
Fax: (412) 904-7804
Email: mczheng@vorys.com

William D. Kloss Jr. (Ohio Bar 0040854)
Martha Brewer Motley (Ohio Bar 0083788)
Rodney A. Holaday (Ohio Bar 0068018)
(*pro hac vice* applications forthcoming)
Vorys, Sater, Seymour and Pease LLP

52 E. Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-6350
Email: wdklossjr@vorys.com
Email: mbmotley@vorys.com
Email: raholaday@vorys.com

*Attorneys for Plaintiffs General Nutrition
Investment Company and GNC Holdings, Inc.*

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, GNC demands a trial by jury on all issues so triable.


Date: May 17, 2019

/s/ Mark C. Zheng
Mark C. Zheng (Pa. Bar 313510)
Vorys, Sater, Seymour and Pease LLP
500 Grant Street, Suite 4900
Pittsburgh, PA 15219-2502
Phone: (412) 904-7704
Fax: (412) 904-7804
Email: mczheng@vorys.com

William D. Kloss Jr. (Ohio Bar 0040854)
Martha Brewer Motley (Ohio Bar 0083788)
Rodney A. Holaday (Ohio Bar 0068018)
(*pro hac vice* applications forthcoming)
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-6350
Email: wdklossjr@vorys.com
Email: mbmotley@vorys.com
Email: raholaday@vorys.com
*Attorneys for Plaintiffs General Nutrition
Investment Company and GNC Holdings, Inc.*